ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2022-Mar-21 16:19:47
60CV-22-1849
C06D04 : 26 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## CIVIL DIVISION

**DEBORAH SPRINGER SUTTLAR, JUDY GREEN, FRED LOVE,**
**in his individual and official capacity as State Representative,**
**KWAMI ABDUL-BEY, CLARICE ABDUL-BEY, and**
**PAULA WITHERS,**

**PLAINTIFFS**

V.                      Case No. _____

**JOHN THURSTON, in his official capacity**
**as the Secretary of State of Arkansas and in his official capacity**
**as the Chairman of the Arkansas State Board of Election Commissioners;**
**and SHARON BROOKS, BILENDA**
**HARRIS-RITTER, WILLIAM LUTHER,**
**CHARLES ROBERTS, WENDY BRANDON, JAMIE CLEMMER and**
**JAMES HARMON SMITH III, in their official capacities**
**as members of the Arkansas State Board of**
**Election Commissioners,**

**DEFENDANTS**

### COMPLAINT FOR INJUNCTIVE RELIEF
### AND DECLARATORY JUDGMENT

Plaintiffs Deborah Springer Suttlar, Judy Green, State Representative Fred Love, Kwami Abdul-Bey, Clarice Abdul-Bey and Paula Withers for their Complaint for Injunctive Relief and Declaratory Judgment, allege as follows:

### INTRODUCTION

1. Except for Arkansas, every state that was a member of the Confederacy has drawn congressional districts where minority voters have an opportunity to elect candidates of their choice, and all have elected Black representatives to Congress.

2. Arkansas is the only state in the country with a Black population above 10% that has never elected a Black representative to Congress.

3.    This is no mistake. Arkansas's congressional map has long been drawn to thwart the ability of Black voters to elect their candidates of choice. For example, despite the fact that Jefferson and Pulaski Counties are geographically contiguous and have large numbers of Black voters, they have never been in the same congressional district, and neither county has ever been drawn together in a district that includes the eastern and southeastern portions of the state, where the state's most predominantly Black counties are located.

4.    The congressional district map enacted in 2011 (the "2011 Map") exacerbated this problem by splitting Jefferson County between two congressional districts.

5.    And now, with the passage of Senate Bill 743 and its companion, House Bill 1982, the Arkansas General Assembly ("the General Assembly") has taken another affirmative step backwards, enacting a congressional map (the "2021 Map") that *even more systematically* slices and dices Black communities in Arkansas, in particular in Pulaski County.

6.    Historically part of the 2nd Congressional District, Pulaski County, is the most populous county in the State and home to the largest Black population in Arkansas. Under the 2021 Map, Black voters in Pulaski County are divided among three of Arkansas's four congressional districts, with the intended and obvious effect of further diluting Black voting power in Southern and Central Arkansas.

7.    In 2020, Arkansas experienced a modest uptick in its turnout rate because of the expansion of absentee voting in response to the COVID pandemic. Notably, 85% of the increased turnout statewide came from Pulaski County. In response to that increased turnout, the General Assembly undermined Black voting power by further cracking Black communities through the 2021 Map.

- 2 -

8.      Governor Asa Hutchinson refused to sign the 2021 Map for exactly that reason: it dilutes the voting strength of Black voters, particularly in Pulaski County. He stated that the 2021 Map "reduc[es] the minority population [in the 2nd Congressional District] and split[s] some of [the minority population] from Pulaski County."[1]

9.      On October 6, Governor Hutchinson told reporters, "There's nothing wrong with dividing a county to achieve the right population requirements and the constitutional standards . . . . What's important is not whether or not you divide Pulaski County, but *how* you divide Pulaski County if you make that decision to do so . . . I would urge them to keep in mind that you do not want to dilute minority representation or influence in Congressional races."[2]

10.     Governor Hutchinson further recognized that dilution of Black voting power is not a new phenomenon in Arkansas's congressional redistricting: under the 2021 Map, "the minority population is widely dispersed in the 4th district, the 2nd district, and the 1st district . . . [as] was [also] true in the last redistricting plan."[3]

11.     The 2021 Map interferes with and impairs the free exercise of suffrage by Black voters in Arkansas, including but not limited to Plaintiffs, by diluting, impairing, and undermining their ability to elect their candidates of choice.

_____

[1] Under Arkansas law, the Governor may sign a bill into law, veto it, or choose to allow a bill to become law without signing it. With regard to the 2021 Map, the Governor chose to allow the two companion bills to become law without his signature for the express purpose of "enabl[ing] those who wish to challenge the redistricting plan in court to do so." Andrew DeMillo, *Arkansas governor Oks House map splitting Little Rock area,* Associated Press (Oct. 13, 2021), https://apnews.com/article/congress-asa-hutchinson-arkansas-little-rock-elections-ef96ca92ca6a5bd99f2e6beba715a6cb.

[2] Governor Hutchinson's Weekly Media Briefing, YouTube, at 20:03 (Oct. 6, 2021), available at https://www.youtube.com/watch?v=T5E0Pn99DDo.

[3] Governor Hutchinson's Weekly Media Briefing, YouTube, at 21:54 (Oct. 13, 2021), available at https://www.youtube.com/watch?v=xMysBu7B_SA.

- 3 -

12.     As a result, the 2021 Map violates the Free and Equal Elections Clause of the Arkansas Constitution, which guarantees that "[e]lections shall be free and equal," and that "[n]o power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage; nor shall any law be enacted whereby such right shall be impaired or forfeited," Ark. Const. art. 3, § 2, as well as the Equal Protection Clause, which further guarantees that "[t]he equality of all persons before the law" and "shall ever remain inviolate," *id.* art. 2, § 3.

13.     Accordingly, Plaintiffs respectfully request that this Court enter an Order declaring the 2021 Map unconstitutional; enjoining Defendants from any implementation of the 2021 Map; and compelling the adoption of a valid congressional map that does not unconstitutionally dilute Black voting power or target Black voters in deprivation of their rights guaranteed by the Arkansas Constitution.

## PARTIES

14.     Deborah Springer Suttlar's Little Rock address, where she has lived for 22 years, was within the 2nd Congressional District under the 2011 Map and continues to be located in the 2nd Congressional District under the 2021 Map. Ms. Suttlar is a Black Arkansas voter who regularly supports candidates who she believes would best serve Arkansas's Black community. Ms. Suttlar grew up in Southeast Pulaski County, which has now been moved into the 1st Congressional District. Ms. Suttlar believes that her vote will be less effective under the 2021 Map because Black voters in Pulaski County who would have supported her preferred congressional candidates have now been moved out of her district. The 2021 Map unnecessarily and systemically cracks Arkansas's Black voting population -- including Ms. Suttlar -- across three different congressional districts, diluting the strength of their voting power.

15.     Judy Green's Little Rock address, where she has lived for 53 years, was located in the 2nd Congressional District under the 2011 Map and continues to be located in the 2nd Congressional District under the 2021 Map. Ms. Green is a Black Arkansas voter who regularly supports candidates who she believes would best serve Arkansas's Black community. Ms. Green believes that her vote will be less effective under the 2021 Map because Black voters in Pulaski County who would have supported her preferred congressional candidates have now been moved out of her congressional district. Ms. Green is also a Justice of the Peace and represents the 9th District on the Pulaski County Quorum Court. She has held this position since 2011. Under the 2021 Map, Ms. Green's Justice of the Peace District is split across three congressional districts. This makes it more difficult for her constituents to elect their preferred candidate. It also makes it more difficult (and less effective) for Ms. Green to communicate and represent her constituents' interests to their representatives in Congress. The 2021 Map unnecessarily and systemically cracks Arkansas's Black voting population -- including Ms. Green -- across three different congressional districts, diluting the strength of their voting power.

16.     Fred Love is a Black voter and long-time resident of Pulaski County and is a state representative who represents Arkansas's 29th State House District in southwestern Pulaski County. Before the passage of the 2021 Map, Representative Love voted in Arkansas's 2nd Congressional District. Under the 2021 Map his Mabelvale residence is now located in Arkansas's 4th Congressional District. Representative Love regularly supports candidates who he believes best serve Arkansas's Black community and has worked tirelessly to ensure each resident has the opportunity to vote for the candidate of his or her choice, especially Black voters in Pulaski County. Representative Love believes that his vote will be less effective under the 2021 Map because he has been moved out of the 2nd Congressional District and into a district that is even

less likely to elect his preferred candidate. The 2021 Map unnecessarily and systemically cracks Arkansas's Black voting population -- including Representative Love -- across three different congressional districts, diluting the strength of their voting power. The 2021 Map also harms Representative Love in his role as a state representative, as his constituents are now dispersed among multiple congressional districts. This makes it more difficult (and less effective) for Representative Love to communicate and represent his constituents' interests to their representatives in Congress.

17.     Plaintiff Kwami Abdul-Bey is a Black voter residing in Pulaski County and a community organizer. For many years, Mr. Abdul-Bey has worked to keep the citizens of Pulaski County engaged in the political process regardless of party affiliation, including most recently by raising awareness about the detrimental effects of the 2021 Map on Black voters in the county. Mr. Abdul-Bey has long advocated for fairer maps that are more competitive and less partisan and that would protect Black voters' right to have a reasonable opportunity to elect their preferred candidates of choice in local, state, and federal elections. Under the 2011 Map, Mr. Abdul-Bey's residence was within Arkansas's 2nd Congressional District, and it continues to be in the 2nd Congressional District under the 2021 Map. Mr. Abdul-Bey regularly supports candidates who he believes would best serve Arkansas's Black community. Mr. Abdul-Bey believes that his vote will be less effective under the 2021 Map because Black voters in Pulaski County who would have supported his preferred congressional candidates have now been moved out of his congressional district and replaced by overwhelmingly White voters from Cleburne County. The 2021 Map unnecessarily and systemically cracks Arkansas's Black voting population -- including Mr. Abdul-Bey -- across three different congressional districts, diluting the strength of their voting power. The 2021 Map will also limit Mr. Abdul-Bey's ability to organize around congressional elections

- 6 -

and will make it harder to convince Black voters in Pulaski County to engage in the political process, as it will be nearly impossible for these voters to elect their preferred candidate to Congress.

18.     Plaintiff Clarice Abdul-Bey is also a Black resident of Pulaski County affected by the 2021 Map. Mrs. Abdul-Bey has been active in raising awareness around the unfair treatment that the 2021 Map imposes upon Black voters in Pulaski County. Mrs. Abdul-Bey regularly supports candidates who she believes would best serve Arkansas's Black community. Mrs. Abdul-Bey was previously within Arkansas's 2nd Congressional District and continues to reside in the 2nd Congressional District. The 2021 Map unnecessarily and systemically cracks Arkansas's Black voting population -- including Mrs. Abdul-Bey -- across three different congressional districts, diluting the strength of their voting power and, consequently, Mrs. Abdul-Bey believes that her vote will be less effective because Black voters in Pulaski County who would have supported her preferred congressional candidates have now been moved out of her district.

19.     Plaintiff Paula Withers is a Black Arkansan and has lived at her Pulaski County residence for 13 years. Ms. Withers was within the 2nd Congressional District. But under the new lines drawn by the 2021 Map, Ms. Withers is now within the 4th Congressional District. Ms. Withers is a registered voter who regularly supports candidates who she believes would best serve Arkansas's Black community. The 2021 Map unnecessarily and systemically cracks Arkansas's Black voting population -- including Ms. Withers -- across three different congressional districts, diluting the strength of their voting power. Ms. Withers believes that her vote will be less effective under the 2021 Map because she has been moved out of the 2nd Congressional District and into a district that is even less likely to elect her preferred candidate.

20.     Defendant John Thurston ("Secretary Thurston") is the Arkansas Secretary of State and the chief elections officer in the State of Arkansas. *See* Ark. Const. art. 6, § 1. Secretary Thurston is the chairperson and secretary of the State Board of Election Commissioners (the "Board"), which has broad authority under Arkansas law to administer and ensure compliance with state election law. Ark. Code Ann. § 7-4-101(b).

21.     Defendants Sharon Brooks, Bilenda Harris-Ritter, William Luther, Jamie Clemmer, Wendy Brandon, and James Harmon Smith III are members of the Board (collectively, "the Commissioners"). The Commissioners are responsible for undertaking the official duties of the Board, including among other things, training election officers and county election commissioners to administer elections throughout Arkansas, including elections for the United States House of Representatives, monitoring and implementing election laws, and investigating alleged election misconduct and election law violations. Ark. Code Ann. § 7-4-101(f).

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under Amendment 80 to the Arkansas Constitution and the Arkansas Declaratory Judgment Act, Ark. Code Ann. § 16-111-101, *et seq*. This Court has personal jurisdiction over the Defendants under Ark. Code Ann. § 16-4-101(B).

23.     Venue is proper in Pulaski County under Ark. Code Ann. § 16-60-104(3)(A).

## FACTS

I.     **For the past 80 years, Black Arkansans have suffered under congressional maps that have diluted their votes and impaired their ability to elect their preferred candidates.**

24.     By separating counties with the largest Black populations among two or more congressional districts, the General Assembly has subdivided the state in such a way that the Black

vote has been systematically diluted since at least 1961, which was the first year in which Arkansas had four congressional districts as it does today.

25.      In recent years, that vote dilution has become even more extreme.

26.      For example, under the 2001 congressional district map ("2001 Map"), Pulaski and Jefferson Counties—both of which have large Black voting age populations and are geographically contiguous—were divided between two separate congressional districts: the 2nd and the 4th. And Pulaski and Jefferson Counties were both drawn into separate districts from counties with similarly large Black voting age populations in the eastern and southeastern parts of the state, including Crittenden, St. Francis, Lee, and Phillips Counties, which were part of the 1st Congressional District.



27.      Under the 2011 Map, the 2nd Congressional District encompassed all of Pulaski County, including Little Rock and surrounding areas, and—based on 2010 Census data—had a Black voting-age population ("BVAP") of 20%. The 1st Congressional District had a BVAP of

16.7%, the 3rd Congressional District had a BVAP of 2.7%, and the 4th Congressional District had a BVAP of 18.7%.

28.    The figure below depicts the 2011 Map that was in place before the 2021 Map became effective this past January.



29.    The 2011 Map diluted the voting strength of Black voters by splitting, for the first time since at least the 1940s, majority-Black Jefferson County across the 1st and 4th Congressional Districts. Once again, the majority of Jefferson County was separated from the counties in the eastern and southern region of the state. And like the 2001 Map before it, Pulaski and Jefferson counties were separated from one another.

**II.    Between 2010 and 2020, population changes in Arkansas were not geographically uniform.**

30.    On September 16, 2021, the United States Census Bureau released data from the 2020 Census to state redistricting authorities and the public.

31.     Based on the state's population growth over the past decade, each congressional district in the 2021 Map must contain an ideal population of approximately 752,881 people.

32.     Population changes over the last ten years were dramatically different across Arkansas's four congressional districts.

33.     According to the 2020 Census, the heavily rural 4th Congressional District was the third slowest-growing congressional district in the country and experienced a 5.8% population decline from 2010 to 2020.

34.     The 1st Congressional District similarly experienced a 1.7% population decline from 2010 to 2020.

35.     By contrast, the 2nd and 3rd Congressional Districts each experienced population growth. The population of the 3rd Congressional District grew by 15.1%, while the population of the 2nd Congressional District grew by 5.5%.

**III.    Between 2010 and 2020, the Black population in Arkansas increased modestly while the non-Hispanic White population decreased.**

36.     According to the 2010 Census, Arkansas had a total population of 2,915,918, of whom 2,173,469 (74.5%) were non-Hispanic White and 468,710 (16.1%) were Black (alone or in combination with another racial group).

37.     According to the 2020 Census, Arkansas has a total population of 3,011,524 persons, of whom 2,063,550 (68.5%) are non-Hispanic White and 495,968 (16.5%) are Black. This represents a total population increase of 95,606 from the 2010 Census.

38.     Arkansas's White population thus *decreased* by 109,919 people (5.0%) since the 2010 census.

39.     Conversely, Arkansas's Black population increased by 27,258 people (5.8%) since the 2010 census.

40.     In 2010, Arkansas had a voting-age population of 2,204,443 persons, of whom 1,708,907 (77.5%) were non-Hispanic White and 321,201 (14.6%) were Black.

41.     As of the 2020 Census, Arkansas has a voting-age population of 2,312,273 persons, of whom 1,653,772 (71.5%) are non-Hispanic White and 351,878 (15.2%) are Black.

42.     Thus, Arkansas's White voting-age population decreased by 55,135 (3.2%) since 2010, while its Black voting-age population increased by 30,677 (9.6%) during that time period.

43.     Between 2010 and 2020, the BVAP of Pulaski County increased by nearly three percentage points, from 32.6% to 35.5%. By contrast, the non-Hispanic White voting-age population of Pulaski County decreased by more than seven percentage points, from 59.6% to 52.4%. In addition to Pulaski County, the counties with the largest Black populations are overwhelmingly located in the eastern and southern parts of the state.

44.     Under the 2020 Census, Arkansas now has six counties in which a majority of the voting-age population is Black, two more than the previous decade. Between 2010 and 2020, the BVAP in Crittenden County increased by from 47.4% to 52.0%, the BVAP in St. Francis County increased from 48.6% to 52.6%, the BVAP is Lee County increased from 53.4% to 54.4%, the BVAP in Jefferson County increased from 52.5% to 55.1%, and the BVAP in Phillips County increased from 59% to 60.8%. Chicot County continues to have a BVAP majority at 51.7% (down very slightly from 51.8% in 2010).

**IV.     The 2021 Map dilutes Black voting strength by splitting Pulaski County and targeting predominantly Black precincts.**

45.     On September 27, 2021, just 11 days after the Census data was released, the joint House and Senate State Agencies and Governmental Affairs Committees met to consider congressional maps that had been proposed by state legislators.

46.    There were several proposed maps that better reflected Black voting strength, but none of those maps were ever seriously considered by the General Assembly.

47.    For example, in Senate Bill 728, Senator Joyce Elliott proposed a map that kept Pulaski County together. Senator Elliott's map also addressed historic Black vote dilution in Arkansas by joining Pulaski and Jefferson Counties in one congressional district and combining them with other heavily Black counties.



48.    Other alternative maps that combined Pulaski and Jefferson Counties, along with other counties with large Black populations in the eastern and southeastern parts of the state, were proposed by Representative Reginald Murdock in House Bill 1962 and Representative Vivian Flowers in House Bill 1965. Both proposals were rejected.

49.    Representative Stephen Meeks also proposed a map, House Bill 1966, that did not split any counties, including Pulaski County, and drew Jefferson County together with the southeastern corner of the state.

50.     On September 29, only two days after the first committee meetings to consider proposals for congressional redistricting, the General Assembly reconvened at a special legislative session to consider the congressional map proposals. This process was highly unusual. When the State Senate convened on September 30, Senator Mark Johnson noted that the public was only given thirty minutes notice before the bills were to be considered at a Senate public hearing. Senator Ricky Hill noted that he was blindsided by the bills that were introduced.

51.     On October 6, Governor Hutchinson told reporters, "There's nothing wrong with dividing a county to achieve the right population requirements and the constitutional standards . . . . What's important is not whether or not you divide Pulaski County, but how you divide Pulaski County if you make that decision to do so . . . I would urge them to keep in mind that you do not want to dilute minority representation or influence in Congressional races . . . ." Governor Hutchinson's Weekly Media Briefing, *supra* n. 2.

52.     The General Assembly did not heed Governor Hutchinson's advice. That same day, the House and Senate approved House Bill 1982 and Senate Bill 743, two identical versions of the redistricting proposal that divides Pulaski County across the 1st, 2nd, and 4th Congressional Districts, and splits Arkansas counties with the largest Black populations across three of Arkansas's four congressional districts.



53.    Under the 2011 Map and based on the 2010 Census, the 2nd Congressional District had a BVAP of 20.0%. By 2020, the BVAP of the previous 2nd Congressional District grew to 22.6%. But under the 2021 Map, the 2nd Congressional District BVAP is 20.4%.

54.    Instead of capturing the BVAP growth in the area, the 2021 Map removes Black voters from the 2nd Congressional District and disperses them between the 1st and 4th Congressional Districts.

---

[4] *HB 1982 - As Amended Rep. Speaks 1* (last updated Oct. 5, 2021), https://www.arkleg.state.ar.us/Calendars/Attachment?committee=900&agenda=4836&file=HB+1982-+As+Amended+Rep.+Speaks.pdf.

55.     The figure below shows the division of Pulaski County across Arkansas's 1st, 2nd, and 4th Congressional Districts:



56.     Pulaski County was not split at random. The General Assembly intentionally and systematically targeted and further cracked the Black population in the state by surgically removing majority Black precincts—and with them over 21,000 Black residents, including Plaintiffs Love and Withers—within Pulaski County from the 2nd Congressional District.

57.     Thirteen Pulaski County precincts were moved out of the 2nd Congressional District and placed in either the 1st or 4th Congressional Districts. All of these precincts are majority Black.

58.     Additionally, all of these precincts are within the 8th, 9th, or 10th Justice of the Peace districts, all of which are currently represented by Black Justices of the Peace. None of the precincts from the 11th Justice of the Peace District, however, were moved out of the 2nd Congressional District. The 11th Justice of the Peace District is majority White and is represented by a White Republican.

59.     Cleburne County—which was added to the 2nd Congressional District in the 2021 Map—has a BVAP of just 92 persons, or 0.5%.

60.     On information and belief, racial data was considered—at times, exclusively—throughout the map-drawing process.

61.     The 2021 Map builds on the prior racially dilutive congressional maps to achieve even more extreme racial vote dilution by surgically removing Black precincts out of the 2nd Congressional District and subsuming them in the 1st and 4th Congressional Districts.

## V.    The General Assembly failed to adopt redistricting criteria in advance of drawing the 2021 Map.

62.     The General Assembly failed to provide any written criteria in advance of the redistricting process to guide their decision-making.

63.     The Arkansas Board of Apportionment—of which Governor Hutchinson was a member and which was charged with redrawing Arkansas's state legislative maps—articulated nine specific criteria it considered when drawing state legislative maps, with two of the nine criteria expressly concerning the avoidance of racial discrimination: (1) one person, one vote; (2) compliance with Section 2 of the Voting Rights Act; (3) compliance with the Equal Protection Clause of the Fourteenth Amendment; (4) compactness; (5) contiguity; (6) maintaining the cores of existing districts; (7) protecting communities of interest; (8) promoting continuity of representation; and (9) minimizing partisanship or gerrymandering.

64.     The same day that HB 1960 was proposed by Representative Ladyman, he attached a list of seven criteria to the map proposal. These criteria dovetail with seven of the nine redistricting criteria articulated by the Arkansas Board of Apportionment—but specifically omit those two criteria that concern the avoidance of racial discrimination.

## VI.    There was intense public outcry in response to the 2021 Map.

65.     Public outcry over the 2021 Map was swift and decisive.

66.     Little Rock NAACP Chapter President Dianne Curry said, "This is an embarrassment to the state of Arkansas to know in the 21st century we're dealing with blatant discrimination."[5]

67.     "I am deeply concerned about the gerrymandering along racial lines happening in our community, which was designed to dilute the voices of the residents of Little Rock," Mayor Frank Scott said in a statement.[6]

68.     "The 2nd Congressional District is already a majority-Republican congressional district. Believe me, I know," said Senator Clarke Tucker, who ran unsuccessfully for the seat in 2018. "You could change it and keep counties whole and make it even more Republican than it is now without splitting Pulaski County."[7]

69.     Moreover, even proponents of the 2021 Map struggled to defend it, and one senator seemed to admit that Black voters in Pulaski County were cracked in order to appease rural voters in predominantly White counties. Senator Trent Garner stated, "I think that a lot of those rural voters who felt like they were disenfranchised 10 years ago because their counties were split or [there were decisions made] that were outside of what they wanted . . . they feel like this is a fairer map because it makes more natural sense to split up Pulaski County than the other counties."[8]

---

[5] Andrew DeMillo, *supra* n. 1.

[6] Andrew DeMillo, *Arkansas lawmakers OK election map splitting Pulaski County*, Associated Press (Oct. 7, 2021), https://apnews.com/article/congress-arkansas-little-rock-state-legislature-legislature-c509bc0b0cc181c958badd3204975cfc.

[7] Andrew DeMillo, *Arkansas redistrict plan splitting Pulaski County advances*, Associated Press (Oct. 6, 2021), https://apnews.com/article/congress-little-rock-arkansas-redistricting-1d4e90aab34e4d3b2f9d590c76a8ceba.

[8] Michael R. Wickline, Rachel Herzog, *Bills to redraw congressional maps head to governor, changes remove 21,000 Black Pulaski County residents from 2nd District*, Arkansas Democrat Gazette (Oct. 8, 2021), https://www.arkansasonline.com/news/2021/oct/08/bills-to-redraw-congressional-maps-head-to/

70.     "This is clearly racial gerrymandering. It's a classic case and it's also a textbook version of what we called cracking, where you dilute the minority voice," said Debrah Mitchell, the president of the Arkansas Democratic Black Caucus.[9] "There were other maps that did not split county cities and people up in the way that the final map that came out." *Id.*

## VII.    Governor Hutchinson refused to sign the bills adopting the 2021 Map.

71.     Governor Hutchinson was part of the chorus of concerned Arkansans that spoke out against the 2021 Map.

72.     On October 13, he announced that he would neither sign nor veto the two proposed maps approved by the General Assembly.

73.     Specifically, he said that he did "not know" how a court would review the 2021 Map but that, "obviously there will be some concerns that will be reviewed in terms of reducing the minority population [in the 2nd Congressional District] and splitting some of [the minority population] from Pulaski County."[10]

74.     "While the percentage of minority populations for three of the four congressional districts do not differ that much from the current percentages, the removal of minority areas in Pulaski County into two different congressional districts does raise concerns," he said.[11]

75.     The Governor decided to not veto the new map out of deference to legislators and the political process.[12] "This will enable those who wish to challenge the redistricting plan in court to do so," he said. *Id.*

---

[9] Mills Hayes, *Activist call Arkansas redistricting maps racial gerrymandering; GOP disagrees*, KATV (Oct. 13, 2021), https://katv.com/news/local/activist-call-arkansas-redistricting-maps-racial-gerrymandering-gop-disagrees.
[10] Governor Hutchinson's Weekly Media Briefing, *supra* n.3 at 21:54.
[11] Andrew DeMillo, *supra* n.1.
[12] *Id.*

76.     "The governor knows what we know, that the courts will have to get involved to straighten out this illegal mess, and that the Legislature is failing to be a good faith actor in the redistricting process," Democratic Party of Arkansas Chairman Grant Tennille said in a statement.[13]

77.     The General Assembly adjourned on October 15.

78.     Because the Governor refused to sign House Bill 1982 and Senate Bill 743, the 2021 Map became law on November 4, 2021, twenty days after the General Assembly adjourned. *See* Ark. Const. art. 6, § 15.

79.     The 2021 Map became effective on January 14, 2022. *See* Ark. Const. art. 5, § 1.[14]

## VIII.   Voting in Arkansas is racially polarized, such that cracking Black voters across congressional districts makes it harder for these voters to elect their preferred candidates.

80.     Voting in Arkansas is racially polarized. Black voters in Arkansas are politically cohesive and overwhelmingly support Democratic candidates. White voters in Arkansas are also politically cohesive, overwhelmingly support Republican candidates, and historically vote as a bloc to defeat Black voters' preferred candidates. This is true on a statewide basis and in every congressional district.

81.     In Pulaski County, however, voting is less racially polarized than in other areas of the state. While Black voters in Pulaski County are politically cohesive, there is a significant amount of White "crossover" voting in Pulaski County that sometimes allows for the election of Black-preferred candidates. For example, in the 2020 presidential election, Democratic candidate

---

[13] *Id.*

[14] Memorandum from Attorney General Leslie Rutledge to Secretary of State John Thurston, Opinion No. 2021-092 (Nov. 4, 2021), https://geostor-uploads.s3.amazonaws.com/misc/Arkansas_AG_opinion_2021-092.pdf.

Joe Biden won Pulaski County with approximately 60% of the vote, despite Pulaski County's BVAP of 35.5%.

82.     In 2018, a Black candidate, Terri Hollingsworth, won election as Pulaski County Circuit Clerk with 61.35% of the vote over her White opponent Steve Walden.

83.     The racial voting patterns of Pulaski County illustrate that Black voters in Pulaski County do not necessarily need to comprise a majority of the voting age population in order to elect their preferred candidates.

84.     The General Assembly's failure to capture and reflect Black voting strength in the 2021 Map, particularly in and around Pulaski County, impairs Black voters' opportunity to elect their preferred candidates.

## COUNT I

### Free and Equal Elections Clause
### Ark. Const. art. 2 § 3

85.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs.

86.     The Free and Equal Elections Clause of the Arkansas Constitution guarantees: "Elections shall be free and equal. No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage: nor shall any law be enacted whereby such right shall be impaired or forfeited, except for the commission of a felony, upon lawful conviction thereof." Ark. Const. art. 3, § 2.

87.     An election is only free and equal when "all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters" and when it is "conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government." *League of Women Voters v. Commonwealth*, 645 Pa. 1, 100, 178 A.3d 737, 804 (2018); *see also* Op. of the

Ct., *Harper v. Hall*, 2022-NCSC-17, ¶ 140 (N.C. Feb. 14, 2022) ("[F]or an election to be free and the will of the people to be ascertained, each voter must have substantially equal voting power and the state may not diminish or dilute that voting power . . . . ").

88.    The 2021 Map violates the Arkansas Free and Equal Elections Clause because it intentionally and systematically targets and cracks Black communities in Pulaski County and throughout the state, thereby diluting the votes of Black voters like Plaintiffs relative to other members of the electorate.

89.    Under the 2021 Map, Black voters in Arkansas do not have the equal right to participate in the election of their representatives to Congress as guaranteed them by the Arkansas Constitution.

90.    The 2021 Map will also undeniably "impair[]" Plaintiffs' "right of suffrage," Ark. Const. art. 3, § 2, because they will have less opportunity than other members of the Arkansas electorate to participate in the political process and to elect representatives of their choice to Congress.

91.    When a law infringes on a fundamental right, like the right to vote, "it cannot survive unless 'a compelling state interest is advanced by the statute and the statute is the least restrictive method available to carry out the state interest.'" *Jegley v. Picado*, 349 Ark. 600, 632, 80 S.W.3d 332, 350 (2002) (quoting *Thompson v. Ark. Soc. Servs.*, 282 Ark. 369, 374, 669 S.W.2d 878, 880 (1984)). When a fundamental right is at stake, the burden is on the state to "prove a compelling state interest." *Pritchett v. City of Hot Springs*, 2017 Ark. 95, *3, 514 S.W.3d 447, 450 (2017).

92.    The racial vote dilution resulting from the 2021 Map lacks any compelling state interest.

93.    But even if some less exacting level of scrutiny applies (and it does not), there is no legitimate state interest whatsoever in the 2021 Map's further assault on Black voting power in Arkansas, which only exacerbates the state's long history of racial vote dilution.

94.    Accordingly, the 2021 Map must be invalidated pursuant to Article 2, Section 3 of the Arkansas Constitution.

## COUNT II

**Equal Protection**
**(Ark. Const. art. 2, §§ 2, 3, & 18)**

95.    Plaintiffs incorporate by reference the allegations of all preceding paragraphs.

96.    The Arkansas Constitution contains no less than three guarantees to the people of equal protection of its laws. First, at its most fundamental level, it guarantees that "[a]ll men are created equally free and independent, and have certain inherent and inalienable rights: amongst which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property, and reputation; and of pursuing their own happiness. To secure these rights governments are instituted among men, deriving their just powers from the consent of the governed." Ark. Const. art. 2, § 2. Second, its Equal Protection Clause assures that "[t]he equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity; nor exempted from any burden or duty, *on account of race, color or previous condition*." Ark. Const. art. 2, § 3 (emphasis added). Finally, Arkansas's Equal Rights Amendment further provides that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Ark. Const. art. 2, § 18.

97.    "The guarantee of equal protection serves to '[protect] minorities from discriminatory treatment at the hands of the majority. Its purpose is not to protect traditional values

and practices, but to *call into question* such values and practices when they operate to burden disadvantaged minorities.'" *Jegley*, 80 S.W.3d at 350 (emphasis in original) (citation omitted).

98.     When an equal protection challenge implicates a "suspect classification," such as a classification based on race, it "warrant[s] strict scrutiny." *Howton v. State*, 2021 Ark. App. 86, *7, 619 S.W.3d 29, 35 (2021).

99.     Because the 2021 Map, like its predecessor maps since the Jim Crow era in Arkansas, dilutes the vote of Black Arkansans based on their race, it is subject to strict scrutiny.

100.    There is no compelling state interest to justify the 2021 Map's racial vote dilution.

101.    But even if some less exacting level of scrutiny applies (and it does not), there is no legitimate state interest whatsoever in the 2021 Map's further assault on Black voting power in Arkansas, which only exacerbates the state's long history of racial vote dilution.

102.    Accordingly, the 2021 Map must be invalidated pursuant to Article 2, Sections 2, 3, and 18 of the Arkansas Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

(a)     Declaring that the 2021 Map violates the Free and Fair Elections Clause or the Arkansas Constitution, along with the Constitution's various equal protection provisions;

(b)     Enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing the 2021 Map;

(c)     Ordering the adoption of a valid congressional plan that does not unconstitutionally dilute the vote of Black voters in Arkansas;

(d)    Granting any such other and further relief as this Court deems just and proper, including but not limited to Plaintiffs' attorneys' fees.

Respectfully submitted, this 21st day of March, 2022.

/s/ Jess Askew III

Jess Askew III, Ark. Bar No. 86005
KUTAK ROCK LLP
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201-3740
Tel: (501) 975-3141
Fax: (501) 975-3001
jess.askew@kutakrock.com

Alexander T. Jones (2015246)
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
Tel: (501) 212-1241
Fax: (501) 376-9442
alexandertaylorjones@gmail.com

Abha Khanna*
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
Tel: 206.656.0177
Fax: 202.968.4498
akhanna@elias.law

Joshua L. Harris*
Aaron M. Mukerjee*
Marilyn Gabriela Robb*
ELIAS LAW GROUP LLP
10 G Street NE
Suite 600
Washington, DC 20002
Tel: (202) 968-4654
Fax: (202) 968-4498
jharris@elias.law
amukerjee@elias.law
mrobb@elias.law

*Counsel for Plaintiffs*

*Motions for Pro Hac Vice Forthcoming